J-S30008-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JOSEPH KELSEY | |
| Appellant | No. 2083 EDA 2014 |

Appeal from the Judgment of Sentence February 25, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0004554-2010

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED JUNE 23, 2015**

Appellant, Joseph Kelsey[1], appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions of second-degree murder, robbery, criminal conspiracy, firearms not to be carried without a license, carrying firearms in public in Philadelphia, possessing instruments of crime, and intimidation of a witness.[2]  We affirm in part and vacate in part.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to

---

[1] On pages 7 and 9 of the trial court's opinion, the court refers to Appellant as "Derrick Kelsey," which is an alias for Appellant.

[2] 18 Pa.C.S.A. §§ 2502(b), 3701(a)(1)(i), 903(c) (3701(a)(1)(i) related), 6106(a)(1), 6108, 907(a), and 4952(a)(1), respectively.

restate them.[3]

      Appellant raises the following issues for our review:

> IS APPELLANT ENTITLED TO AN ARREST OF JUDGMENT WITH RESPECT TO HIS CONVICTIONS FOR MURDER OF THE SECOND DEGREE, CRIMINAL CONSPIRACY, ROBBERY, CARRYING A FIREARM WITHOUT A LICENSE, CARRYING A FIREARM ON THE STREET OR PUBLIC PROPERTY IN PHILADELPHIA, POSSESSING INSTRUMENTS OF CRIME, AND INTIMIDATION OF A WITNESS SINCE THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE VERDICTS OF GUILT AS THE COMMONWEALTH FAILED TO SUSTAIN ITS BURDEN OF PROVING APPELLANT'S GUILT BEYOND A REASONABLE DOUBT?
>
> IS APPELLANT ENTITLED TO HAVE HIS SEPARATE SENTENCE FOR ROBBERY VACATED SINCE IMPOSITION OF A SEPARATE SENTENCE FOR ROBBERY FOLLOWING CONVICTION FOR SECOND DEGREE MURDER VIOLATES DOUBLE JEOPARDY?

(Appellant's Brief at 4).

      After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Steven R. Geroff, we conclude Appellant's issue one merits no relief.[4] The trial court

---

[3] The following errors appear in the trial court's opinion:
(a)   page 3, line 4, the court sentenced Appellant on <u>February 25, 2014</u>, not March 5, 2014;
(b)   page 3, line 7, Appellant timely filed his notice of appeal on <u>July 22, 2014</u>, not July 28, 2014;
(c)   page 10, paragraph 4, line 2, the court mistakenly refers to witness, "Robin Gore," as "Robert Gore."

[4] In his first issue, Appellant fails to provide argument regarding the sufficiency of the evidence for his convictions of robbery, firearms not to be carried without a license, carrying firearms in public in Philadelphia, and
*(Footnote Continued Next Page)*

opinion comprehensively discusses and properly disposes of Appellant's first issue. (*See* Trial Court Opinion, filed, November 7, 2014, at 16-17, 20) (finding: evidence was sufficient to find Appellant guilty of second-degree murder; Appellant admitted he had dispute with victim, William Duvall, over marijuana, returned to witness', Robin Gore, home with co-defendant, Malik Woods, to resolve dispute, was armed and present for shooting, and took out gun and told victim, "Fuck that, I want mine," immediately before victim was shot; second witness, Lamont Lester, testified that Appellant and co-defendant entered Mr. Gore's basement armed with guns, Appellant and victim argued over marijuana, and Appellant pointed his gun at victim's face and fired; Mr. Gore testified there had been dispute between Appellant and victim over marijuana, Appellant aimed gun at victim and shot him, and then Appellant went into victim's pockets and left with co-defendant; evidence was sufficient to convict Appellant of conspiracy; Appellant conspired with co-defendant to rob victim and, therefore, was guilty of any acts done in furtherance of conspiracy by co-defendant; jury could have concluded beyond reasonable doubt that Appellant and co-defendant entered into and carried out agreement to rob victim after learning victim had shorted

_(Footnote Continued)_ ───────

possessing instruments of crime. Therefore, these claims are waived. *See* Pa.R.A.P. 2119(a); *Coulter v. Ramsden*, 94 A.3d 1080, 1088 (Pa.Super. 2014) (stating: "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived").

Appellant on marijuana purchase; evidence was sufficient to find Appellant guilty of intimidation of witness, where Mr. Gore testified that, once Appellant shot victim, Appellant pointed his gun at Mr. Gore and told him not to say anything, and Mr. Lester corroborated Mr. Gore's testimony when Mr. Lester testified Appellant warned Mr. Gore, "You better not say nothing"). The record supports the trial court's decision on issue one. Therefore, we see no reason to disturb it. Accordingly, as to Appellant's first issue, we affirm on the basis of the trial court's opinion.

In his second issue, Appellant argues his separate sentence for the predicate offense of robbery is impermissible because robbery merges with second-degree murder for sentencing purposes. Appellant maintains a separate sentence for robbery following a conviction for second-degree murder violates double jeopardy. Appellant concludes this Court should vacate his sentence for robbery. We agree.

"A claim that crimes should have merged for sentencing purposes raises a challenge to the legality of the sentence. Therefore, our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Quintua***, 56 A.3d 399, 400 (Pa.Super. 2012), *appeal denied*, 620 Pa. 730, 70 A.3d 810 (2013). "A challenge to the legality of the sentence may be raised as a matter of right, is non-waivable, and may be entertained so long as the reviewing court has jurisdiction." ***Commonwealth v. Robinson***, 931 A.2d 15, 19-20 (Pa.Super. 2007) (*en banc*). Whether offenses merge at

sentencing implicates Section 9765 of the Sentencing Code, which provides:

### § 9765.  Merger of sentences

No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act **and** all of the statutory elements of one offense are included in the statutory elements of the other offense.  Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765 (emphasis added).  In light of our Supreme Court's decision in *Commonwealth v. Tarver*, 493 Pa. 320, 426 A.2d 569 (1981), a sentencing court has no authority to impose a sentence for felony murder as well as a sentence for the predicate offense.  *See also Commonwealth v. Gillespie*, 512 Pa. 349, 516 A.2d 1180 (1986) (restating principle that imposition of separate sentence for underlying felony in felony murder conviction violates Double Jeopardy clause); *Commonwealth v. Garnett*, 485 A.2d 821 (Pa.Super. 1984) (explaining court erred by imposing twenty to forty years' imprisonment on convictions for burglary, arson, and related offenses, in addition to concurrent terms of life imprisonment imposed for convictions on two counts of second degree murder, where burglary and arson convictions were constituent offenses of felony murders); *Commonwealth v. Fortune*, 451 A.2d 729 (Pa.Super. 1982) (holding felony murder and predicate offense merge for sentencing purposes).

"When a defendant challenges one of several interdependent sentences, he, in effect, challenges the entire sentencing plan." *Commonwealth v. Goldhammer*, 512 Pa. 587, 593, 517 A.2d 1280, 1283

- 5 -

(1986), *cert. denied*, 480 U.S. 950, 107 S.Ct. 1613, 94 L.Ed.2d 798 (1987) (citation omitted). "Where we determine that a sentence must be corrected, this Court has the option of amending the sentence directly or remanding it to the trial court for resentencing. If a correction by this Court may upset the sentencing scheme envisioned by the trial court, the better practice is to remand." **Commonwealth v. Dobbs**, 682 A.2d 388, 392 (Pa.Super. 1996). This Court has also held that when the sentences, "run concurrently, we need not remand for resentencing. Instead this Court merely vacates appellant's sentence…." **Commonwealth v. Vazquez**, 476 A.2d 466, 469 (Pa.Super. 1984). **See, e.g., Commonwealth v. Turner**, 434 A.2d 827 (Pa.Super. 1981) (holding no need to remand for resentencing when sentences are imposed concurrently); **Commonwealth v. Eberts**, 422 A.2d 1154 (Pa.Super. 1980) (holding same).

Instantly, the court sentenced Appellant to life imprisonment for his second-degree murder conviction as well as a concurrent five (5) to ten (10) years' imprisonment for the underlying robbery conviction. The court had no authority to impose a separate sentence for the robbery conviction, where the robbery constituted the predicate felony for Appellant's felony murder conviction. **See Tarver, supra**. The Commonwealth concedes we have a basis to grant relief on Appellant's second issue. Therefore, we vacate Appellant's judgment of sentence for robbery. **See Vazquez, supra**. Accordingly, we affirm the convictions, vacate the separate sentence for

robbery, and affirm the judgment of sentence in all other respects.

Judgment of sentence affirmed in part and vacated in part.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/23/2015

# IN THE COURT OF COMMON PLEAS
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### TRIAL DIVISION – CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA        :   **CP-51-CR-0004554-2010**

               :

               :

         **VS.**        :



CP-51-CR-0004554-2010 Comm. v. Kelsey, Joseph
Opinion

               :   **SUPERIOR COURT**

               :   **NO. 2083 EDA 2014**

**JOSEPH KELSEY**                            :

7220337131

**FILED** OPINION

NOV 07 2014

**GEROFF, J.**        Criminal Appeals Unit             **NOVEMBER 7, 2014**
First Judicial District of PA

On February 25, 2014, after a jury trial, Defendant, Joseph Kelsey, was found guilty of murder of the second degree, robbery, conspiracy, carrying a firearm without a license, carrying a firearm on the public streets, possessing an instrument of crime, and intimidation of a witness. (N.T. 02/25/2014, p. 149). For the conviction of murder of the second degree, defendant was sentenced to life imprisonment without parole. A concurrent sentence of five (5) to ten (10) years of imprisonment was imposed on the conviction of robbery and a concurrent term of five (5) to ten (10) years of imprisonment was imposed on the conviction of criminal conspiracy. A concurrent sentence of two and half (2.5) to five (5) years of imprisonment was imposed for carrying a firearm without a license. A consecutive sentence of five (5) to ten (10) years of imprisonment was imposed on the conviction of intimidation of a witness. No further penalty was imposed on the convictions of carrying a firearm on the public streets and possessing an instrument of crime.

1

The Issues:

Defendant Kelsey has raised the following issues verbatim on appeal:

- The defendant is entitled to an arrest of judgment with respect to his convictions for murder of the second degree, criminal conspiracy, robbery, carrying a firearm without a license, carrying a firearm on the street or public property in Philadelphia, possessing instruments of crime and intimidation of a witness since the evidence is insufficient to sustain the defendant's guilt beyond a reasonable doubt. (N.T. 2/25/2014 p. 144-146). The Commonwealth's evidence failed to establish that the defendant was responsible for the death of the victim, that the defendant robbed or attempted to rob the victim, that the defendant possessed or used a weapon or instrument of crime, that the defendant entered into a conspiracy to rob or kill the victim, that the defendant was an accomplice to the robbery or killing of the victim or that the defendant intimidated a witness or a was a co-conspirator or accomplice to an intimidation.[1]

## PROCEDURAL HISTORY

On January 19, 2010, Defendant Joseph Kelsey was arrested at the North American Motor Inn at 4444 City Line Avenue. (N.T. 02/24/2014, p. 41). Shortly afterwards, he was charged with one count of aggravated assault, two counts of conspiracy, one count of intimidation of a witness, one count of terroristic threats, one count of simple assault, one count of murder, one count of robbery, one count of burglary, one count of firearms not to be carried without a license, one count of carrying firearms on the public streets, one count of possessing an

---

[1] See Def.'s Concise Statement of Errors Complained of on Appeal

2

instrument of crime, and one count of recklessly endangering another person for events which occurred at or near 5530 Willows Avenue in the City and County of Philadelphia.

On April 13, 2010, a Preliminary Hearing was held for Defendant Kelsey and his alleged co-conspirator, Malik Woods. On February 25, 2014, the jury returned its verdict. On March 5, 2014, sentence was imposed. Defendant's post-sentence motion was denied pursuant to Pennsylvania Rule of Criminal Procedure 720.B (3) on July 8, 2014. Defendant filed his Notice of Appeal on July 28, 2014. A Concise Statement of Matters Complained of on Appeal pursuant to Pa. R.A.P. 1925(b) was ordered on July 30, 2014. Defendant filed the Statement on July 31, 2014.

The Defendant challenges the sufficiency of the evidence, seeking an arrest of judgment.[2]

## THE EVIDENCE

### Elizabeth Duval

Elizabeth Duval, the mother of the decedent, became aware of his death on December 12, 2009. (N.T. 02/20/2014, p. 57). She last saw her son the day before he was killed. *Id.*

### Dr. Sam Gulino

Dr. Sam Gulino, the chief medical examiner for the City of Philadelphia, testified that he performed an autopsy on the body of William Duval. (N.T. 02/20/14, p. 65). According to Dr. Gulino, Duval sustained two gunshot wounds. One of the gunshot wounds was to the front left aspect of Duval's neck; the other was to Duval's right wrist. *Id.* at 67. The x-rays of Duval's body showed that bullets were still present in the body associated with those two gunshot

---

[2] *Id.*

3

wounds. Dr. Gulino also found several scrapes on the body, specifically on the right side of the forehead, on the front of the chest, on the right forearm, and on the left leg. According to Dr. Gulino, the scrapes were recent; they showed no sign of healing or scabbing, so they must have had occurred within 24 hours or so before death. *Id.*

Dr. Gulino set forth in detail for the jury's benefit the nature of the wounds sustained by the decedent and concluded that the cause of death was a gunshot wound to the neck and that the manner of death was homicide. (N.T. 02/20/2014, pp. 64-74). He did not observe soot or stipple on the wounds or on the victim's clothing and concluded that the range of fire was at least two to three feet from the victim. *Id.* at 72-79.

Lamont Lester

Lamont Lester testified that on December 12, 2009, he was at the residence of Robin Gore located at 5530 Willows Avenue in Philadelphia. *Id.* at 83. He and Gore were sitting together in the basement drinking beer, and they began watching a movie. *Id.* After a while, the victim, William Duval, whom Lester referred to as "Bill," came and joined them in the basement. Bill received a phone call and went outside for a minute. *Id.* at 81-84. Mr. Duval returned with two other males, both of whom were flashing their guns. *Id.* at 83, 101. An argument then broke out between Duval and one of the armed males, whom Lester identified as Joseph Kelsey. *Id.* at 84. Lester described the other male who returned with Duval as a little light-skinned guy who was young and short. *Id.* at 89-90, 98. Lester described him as younger and lighter-skinned than Kelsey. *Id.* at 89-90. The light-skinned male began waving his gun around at both Lester and at Robin Gore as soon as he walked in the door *Id.* at 90, 101.

4

The argument between Duval and Kelsey concerned marijuana; Kelsey said to Duval, "I thought you had it." *Id.* at 85. According to Lester, they were arguing over some weed. *Id.* After Kelsey uttered those words, Kelsey and Duval began "tussling." *Id.* 85. In court, Lester described the tussling between Duval and Kelsey by waving his arms in front of his body. *Id.* at 86. The two were fighting; then Kelsey raised his arm, put his gun about four feet away from Duval's face, and fired the gun. *Id.* at 85. Bill then fell to the ground. *Id.* at 87. Lester recalls hearing only one gunshot. *Id.*

When the gun was fired, Lester got up against the wall and crouched down on the floor. *Id.* at 97. Kelsey pointed his gun at Robin Gore, telling him, "You better not say nothing." *Id.* at 87. Kelsey and the light-skinned male ran out the door. *Id.* Afterwards, Lester went home, where he was met by detectives. *Id.* at 88. When Lester made his written statement to detectives, a detective then showed him a photo array. *Id.* at 92. In the photo array, he identified Robin Gore and Joseph Kelsey. *Id.* at 92-93. At no point during the photo array did he ever identify Malik Woods. *Id.* at 98. He was also shown another photo array containing a picture of Malik Woods, but did not identify Woods. *Id.* at 98-99.

In his statement to detectives, Lester said that as soon as they soon as they came in, one of the guys said, "I thought you said you had it," and then struck the decedent on the side of the head with a chrome-plated gun with a black handle. *Id.* at 105. (Ex. C-3, p. 2). The other male individual accompanying Lester then ran out the door. However, at trial, Lester said that he did not previously say that he saw the decedent being struck in the head with a gun. (N.T. 02/20/14, p. 96).

5

Detective James Crone

Detective James Crone testified that he went out to the crime scene at 5530 Willows Avenue, where he gathered evidence. *Id.* at 111. When he arrived, he observed the body of the decedent. According to Detective Crone, the victim's body was in the basement level lying on his back. *Id.* at 112. The victim's body was resting parallel to the stairs leading to the basement. He observed the decedent to be dead, and observed the gunshot wound to the decedent's upper left-hand side of the neck. *Id.* Detective Crone did not see any indication that the body had been moved; nor did he see any streaks or trails of blood around the body. *Id.* at 113.

Detective Crone searched the area for ballistic evidence, but found none. *Id.* He observed an entry wound, but no corresponding exit wound, all of which was consistent with the bullet or projectile still being located inside the victim's body. *Id.* at 114. Detective Crone testified that he searched the basement for strike marks, but found none. *Id.* at 114. However, Detective Crone did find other evidence at the scene of the crime. He found several beer bottles located within the proximity of the victim. *Id.* at 115. On a chair next to the decedent, he found a jacket with an arm inside out. On the jacket was dirt which was consistent with the dirt on the bare concrete floor. *Id.* In the jacket were credentials which were discovered to be those of the victim. Detective Crone also found a cellular phone, which was located approximately six feet from the victim's body. *Id.* Marijuana was found underneath the entertainment system in the basement, a circumstance which Detective stated would explain the strong odor of marijuana inside of the basement. *Id.* The detective found a box contained what he believed to be marijuana residue in the rear driveway area. *Id.* at 116. He observed blood splatter on both the east and west walls of the basement, approximately 5 to 6 feet above the ground.

6

Detective Crone testified that he obtained search warrants for 5530 Willows Avenue and 5524 Florence Avenue (the Kelsey residence). *Id.* at 121, 123. Detective Crone testified he participated in a search of both properties. *Id.* Detective Crone recovered various pieces of paperwork at 5524 Florence Avenue.

Robin Gore

Robin Gore testified that he had known William Duval almost his entire life, for over 30 years. *Id.* at 51. Gore testified that in 2009, he was living at 5530 Willows Avenue. *Id.* Gore then identified the parties to the incident by pointing out Derrick Kelsey and Malik Woods. *Id.* at 52. Gore stated that Kelsey is his friend and that Woods was with Kelsey when the incident took place. *Id.*

According to Gore, he had known Kelsey for 15 years, and had worked at the restaurant owned by Kelsey's parents. *Id.* Gore also partnered with Kelsey in a metal-removal business. *Id.*

Gore stated he did not know Malik Woods, but acknowledged that he had seen Malik Woods on occasions prior to the night William Duval was murdered. *Id.* 52-53. Gore stated that Woods would sometimes accompany Kelsey when Kelsey would come over to Gore's house. *Id.* at 53. According to Gore, the decedent was a seller of marijuana and that on the night of the murder, he was selling marijuana in the driveway behind 5530 Willows Avenue. *Id.* at 55.

Gore testified that on the night of the murder, he had just gotten off work and went home. He went to the basement, and was sitting there with Bill Duval and Lamont Lester. According to Gore, they were about to watch a movie. Gore's ex-girlfriend, Sharita Mason, and her two children were also at the residence of 5530 Willows Avenue at the time, but they were upstairs. *Id.* at 54.

7

Gore was asked when he first encountered either of the defendants on the night of the murder, and he replied that he encountered Kelsey after he had gotten off work, between 5 and 6 in the evening. *Id.* at 56. Kelsey called Gore about purchasing marijuana, and Kelsey then came over to 5530 Willows Avenue to buy marijuana from the decedent. *Id.* at 57. Kelsey went down to the basement, where he apparently made the purchase. *Id.* at 57. Kelsey then left. A short time later, Kelsey called Gore and asked to see the decedent again. *Id.* at 58. During this phone call, Kelsey indicated that he wanted to return to make another transaction. Kelsey also indicated that something was short with his last purchase. *Id.* at 83-84. Gore told Kelsey that the decedent was still there, and Kelsey returned. *Id.* at 58.

When Kelsey returned, he and the decedent went outside. They came back, walking inside through the driveway door. *Id.* at 59. At this point, Gore recalls seeing only Kelsey and the decedent; he did not see Woods until later on. *Id.* When Kelsey and the decedent entered the house, the decedent began taking off his jacket, but almost immediately - before he could even finish taking his jacket off - Kelsey pulled out a gun and aimed it at him. Gore recalled that there was a ten-second pause. *Id.* at 59. The decedent then began spinning his jacket in an effort to defend himself and keep the gun out of his face. *Id.* at 60, 95. The gun was fired, and the decedent fell to the ground. *Id.* at 60, 96. At the preliminary hearing, Gore had testified that the gun pointed at the decedent's throat when the shot was fired. N.T. at Bill's throat from under the jacket when the gun went off. (N.T. 04/13/10, p. 33). At the preliminary hearing, Gore acknowledged that the gunshot sounded muffled. *Id.* at 33.

After hearing the first shot and seeing the decedent fall to the ground, Gore saw a second shot from a louder and more powerful gun breeze by him, and noticed Woods in the room holding a gun (N.T. 02/21/14, pp. 60, 64, 90). Gore was surprised to see Woods standing there.

8

*Id.* at 60, 90. Gore believed that the the second shot came from a revolver because of the powerful way the gunfire came out of the gun. *Id.* at 64. Gore identified Kelsey's gun as an automatic, because it did not have a tumbler. *Id.* at 65. Gore said that Woods' gun did not have a tumbler either and appeared to be a semiautomatic. *Id.*

After both shots had been fired, Kelsey pointed his gun at Gore's face and told him not to say anything about what had just happened. *Id.* at 61, 95. Kelsey went into the decedent's pocket(s), probably to take marijuana. *Id.* at 61, 92, 107. (Gore could not recall whether Kelsey went into one or both pockets). *Id.* at 107. According to Gore, the defendants left through the driveway. Lamont Lester then exited the basement by walking up the steps. *Id.* at 66. Gore then dialed 9-1-1, and the police arrived within 3 to 5 minutes. *Id.*

Gore gave detectives a written statement in which he identified Joseph Kelsey and Malik Woods as the perpetrators of the crime. *Id.* at 76, (Ex. C-2). He signed his name at the bottom of each page of the statement and to photos of all parties involved, including those of Malik Woods and Joseph Kelsey. *Id.* at 77, (Ex. C-2). At the preliminary hearing, Gore identified Kelsey and Woods as the perpetrators of the crimes. (N.T. 04/13/14, pp. 7-8, 21-24, 33). At trial, he testified that he had no doubt that Joseph Kelsey and Malik Woods were the individuals who shot the decedent. (N.T. 02/21/14, p. 78).

Gore had told officers at the scene that the assailants were masked men. *Id.* at 67. At trial, Gore explained that he told this story because he loved his friend Derrick, and because he feared for his life. *Id.* at 67-68. According to Gore, he later changed his mind and recanted his story about the masked men because he wanted to tell the truth and because he was uncomfortable with the "mask story." *Id.* at 76.

9

Stipulations

Officer Mark Marchetti

Officer Mark Marchetti would have testified that he and his partner responded to the scene at 5530 Willows Avenue on December 12, 2009, at 5:56 p.m. (N.T. 02/24/14, p. 9). Officer Marchetti would have testified that he and his partner transported Robin Gore from the scene to the Homicide Division. *Id.*

Officer Marchetti would have testified that Robin Gore told him and his partner that two males wearing ski masks broke in through the back basement door, walked up to the victim and shot him. Officer Marchetti would have testified that Gore then added that as the assailants approached the victim, the victim threw a jacket at one of the males to block the gun and started to wrestle with the males, and one of the assailants then shot the victim. *Id.*

Officer David Girard

Had Officer David Girard been called to testify, he would have testified that he responded to 5530 Willows Avenue on December 12, 2009. He also would have testified that when he arrived, the first floor was dark but the second floor was lit. He would have testified that he smelled a strong odor of marijuana inside the property. He would have testified that he hollered down the basement stairs, but did not get a response; he then observed a black female peek her head around the bottom of the stairs. He ordered the female to come up; she did, accompanied by a male. *Id* at 11.

Officer William Hill

Officer William Hill would have testified that on December 12, 2009, he responded to 5530 Willows Avenue. When he responded, he encountered Robert Gore and Sharita Mason. He observed the body of the decedent in the basement floor. He observed marijuana in the

10

basement and cocaine on the dining room table. When asked about what happened, Robin Gore told Officer Hill that two males attacked the decedent in the driveway and that he, Robin Gore, then exited the house, found the decedent bleeding, and dragged him into the house. *Id.* at 10.

Officer Raymond Andrejczak

Officer Raymond Andrejczak testified as an expert in the field of firearms identification and ballistics. Officer Andrejczak concluded with a reasonable degree of scientific certainty that both of the bullets found in the body of the decedent were fired from the same firearm, based on the same microscopic markings on the bullets. *Id.* at 26, 30. In his opinion, the bullets came from the .38/.9 mm family of bullets. That family also includes .357 magnum bullets that would have been fired from a .357 magnum revolver. *Id.* at 27-28. He also concluded that the bullets were fired from a revolver, as the bullets are consistent with revolver bullets. *Id.* at 29-30.

Detective John Rossiter

Detective John Rossiter testified that on January 19, 2010, he arrested Kelsey at the North American Motor Inn on City Line Avenue. (N.T. 02/24/2014, p. 39-41). Defendant Kelsey was arrested at that time. *Id.* at 41. He also testified that on December 16, 2009, Defendant Woods was arrested at Southwest Detectives. *Id.* 39-40.

Sergeant Kenneth Flaville

Sergeant Kenneth Flaville testified that on December 16, 2009, he encountered Malik Woods, who came to Southwest Detectives on 5510 Pine Street asking for Detective Lucke. *Id.* at 44. Sergeant Flaville and Detective Kerwin (first name not stated) brought him inside Southwest Detectives and contacted Detective Lucke. Upon learning that he was wanted for a homicide, they transported Woods to Homicide Headquarters. *Id.* at 45. Sergeant Flaville also

11

testified that while transporting Malik Woods to the Homicide Division, Woods told Flaville that he was present for the homicide, but that it does not mean that he saw anything. *Id.* at 46.

Detective Thorsten Lucke

Detective Thorsten Lucke testified that he interviewed Robin Gore on the evening of the incident. Detective Lucke testified that Gore initially told him that he could not identify the perpetrators of the incident because they were wearing masks. *Id.* at 52. During their first encounter, Gore was very scared and nervous. He also described the person who was killed as a very good friend of his, a long-time friend. Eventually, Gore was able and willing to identify the people whom he had witnessed shoot the decedent. *Id.* at 53-54.

Detective Lucke also testified that in January of 2010, Detective Lucke spoke to Defendant Kelsey on the day of his arrest. *Id.* at 68. The Defendant was in one of the interview rooms. Detective Lucke entered the room, introduced himself, and explained to the Defendant the facts alleged against him. Detective Lucke also advised the Defendant of his rights and gave him the opportunity to give a statement. *Id.* at 68. Defendant decided to give a statement. *Id.* at 68. Detective Lucke issued Miranda warnings to Defendant Kelsey prior to taking the statement. *Id.* at 68, 70-71. (Cmwlth. Ex. C-1). The Defendant signed the Miranda warnings. According to Detective Lucke, after the interview was completed, the Defendant was given all five pages of the interview to review and make any changes. *Id.* at 75. The Defendant then added a phone number for his next of kin or contact person. *Id.*

Defendant Kelsey was asked what had happened at 5530 Willows Avenue on December 12, 2009. He stated that he had gone there to buy some weed from the decedent, to whom he referred as "Dollar." *Id.* at 78. He purchased an ounce of weed for one hundred dollars. *Id.* at 79. When asked if anyone had accompanied him when he had bought the marijuana, Defendant

12

answered that he had been with "another guy." At no point during the interview did the Defendant identify this individual. Defendant was also asked how he first got in touch Dollar to make the transaction. Kelsey answered that he was not sure if Rob had called him, or if he had called Rob. *Id.*

After buying the weed, he went home and measured it. *Id.* at 79. Once he measured it, he realized that he had been shorted a few grams. *Id.* at 78. Defendant then called back and talked to Rob. He asked if he and Dollar had a scale. Rob told him that they did not have a scale and that Dollar was not there. *Id.* at 78. Kelsey called again, and Rob told him that Dollar was there. *Id.* After about twenty minutes had passed from the time he first bought the marijuana, Defendant returned to Rob's house on Willows Avenue. *Id.* at 79. When asked if the other guy was with him when he returned, Defendant answered, "Yes." *Id.* at 79. He told Detective Lucke, "I came there to get my money back or to be straightened out." *Id.* at 83. According to the Defendant, Dollar owed him about 35 to 40 dollars for having shorted him on the purchase. *Id.*

When the Defendant returned to Willows Avenue, he was coming down the alley and saw Dollar outside in the alley. *Id.* at 80. Defendant went inside the house with Dollar, Rob, and the other guy. *Id.* They went into the basement. Dollar was on the phone, but once he hung up, Defendant told him that what he had gotten from him was short. *Id.* Dollar told the Defendant not to worry about it. "Fuck that, I want mine," Kelsey answered. *Id.* Dollar then stood up from his chair and took his jacket off. Defendant then stepped back and pulled out his gun. Dollar stepped toward him, and they began tussling. *Id.* The other guy was behind him when he and Dollar began tussling. *Id.* at 81.

13

In order to demonstrate the tussling, Defendant stood up, faced Detective Lucke, put his left hand on Detective Lucke's shirt collar on the right side of his neck, and had Detective Lucke grab his right hand with his left hand. *Id.*

According to the Defendant, they were tussling in that manner for a few seconds, when he heard a gunshot and saw the decedent stumble a little bit and fall backwards. *Id.* at 81. When the decedent went down, the Defendant saw blood coming from his neck. Defendant then turned around and saw the other guy standing there with a gun raised in his hand. *Id.* at 81. At this point in the interview, in order to depict the other guy, Defendant raised and extended his right arm straight ahead.

The Defendant bent down and took money from the decedent's pocket. *Id.* 81. He said that he took a little over a hundred dollars. He was not sure from which pocket he took the money. *Id.* When Defendant left, the other guy had already left. *Id.* at 81.

When Detective Lucke asked him how many gunshots he heard, Defendant replied, "One." *Id.* Defendant described the gun as a revolver. *Id.* at 82. He did not know what caliber the gun was. According to Defendant, he himself was carrying a nine millimeter, but he never fired it during the incident. After the incident, Defendant threw away his gun in a trash can at 54th and Willows Avenue. *Id.*

Defendant was asked who was present in the basement with him beside Dollar and the other guy. He responded that the other individuals present were Rob and another person, whose name he did not know. *Id.* Dollar was sitting in front of the Defendant, the other guy was behind the Defendant, and Rob and some other guy were over to Defendant's left. *Id.* at 83.

Defendant was asked where he went after the incident took place. "All over," he replied. *Id.* at 83. He was asked if he went home to Wilton Street. "No," he replied. He was asked

14

which way the other guy went. "He went towards 56th Street," he said. "I don't know where he went from there," he added. "I haven't seen him since."

The Defendant was then asked if there was anything he would like to add to the interview. *Id.* at 84. In response, Kelsey explained that he suffered an injury to his left hand during the tussle. According to the Defendant, a bullet from the shooter's gun must have grazed his left hand before it struck the decedent. *Id.* at 84. Kelsey showed and described a quarter-inch long scar on his left hand just to the left of the knuckle of his middle finger. Kelsey did not seek medical attention for the injury and he did not realize that he was hit until sometime after he left the house. *Id.* The interview then concluded. Defendant was then given the opportunity to review the interview to make changes. He also signed a Statement of Adoption Attestation and a statement of non-consent to a videotape and audiotape recording of the interview. *Id.* at 85.

## THE EVIDENCE WAS SUFFICIENT TO CONVICT THE DEFENDANT OF HIS CRIMES.

In passing upon a motion in arrest of judgment, the sufficiency of the evidence must be evaluated upon the entire trial record; all evidence must be read in the light most favorable to the Commonwealth, which is entitled to all reasonable inferences arising therefrom; the effect of such a motion is to admit all facts which the Commonwealth's evidence tends to prove. *Commonwealth v. Johnson*, 428 Pa. Super. 494; 631 A.2d 639 (1993) citing *Commonwealth v. Blevins*, 453 Pa. 481, 483 309 A.2d 421, 422 (1973). See also, *Commonwealth v Meadows*, 471 Pa. 201, 369 A.2d 1266 (1977). This court must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes

15

charged was established beyond reasonable doubt. *Commonwealth v. Randall*, 758 A.2d 669, 674 (Pa.Super.2000).

Defendant Kelsey contends that there is insufficient evidence to establish beyond reasonable doubt his guilt for each of the crimes for which he stands convicted. He argues that he is, therefore, entitled to an arrest of judgment. Defendant was convicted of conspiracy to commit robbery. To be convicted of conspiracy, a person must have agreed with one or more persons to commit a crime; he must have intended to commit the crime; and one or more of them must have committed an overt act in furtherance of the conspiracy. 18 Pa.C.S.A. § 903. Defendant was convicted of robbery. A person is guilty of robbery if, in the course of committing a theft, he inflicts serious bodily injury upon another. 18 Pa.C.S.A. § 3701. Defendant was convicted of second degree murder. A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony. Defendant also challenges his convictions of intimidation of a witness, carrying a firearm on the public streets, possessing an instrument of crime, and carrying a firearm without a license.

The court finds the Defendant's arguments to be meritless. For each of the crimes for which he stands convicted, the evidence against Defendant Kelsey was overwhelming. Defendant Kelsey admitted that there was a dispute over marijuana; that he returned to the house with a companion to resolve the dispute; that he was armed and present for the shooting of the victim; and that immediately before the victim was shot, he said "Fuck that, I want mine," and then pulled out his gun. (N.T. 02/24/2014, p. 79-83). He stated that his companion then shot the victim, who then fell to the ground. *Id.* at 81. Lamont Lester testified that Kelsey and the lighter-skinned individual accompanying him entered the basement armed, with their guns

16

flashing, and that after an argument began between the decedent and Kelsey over marijuana, Kelsey pointed his gun toward the decedent's face and then fired his gun. (N.T. 02/20/2014, p. 83, 85-87, 101). Gore testified there had been a dispute over marijuana and that Kelsey pulled out his gun, aimed it at Bill, and then shot him. (N.T. 02/21/2014, p. 59-60, 83-84). Kelsey, in his interview, admitted he then took money out of the decedent's pockets. (N.T. 02/24/2014, p. 81). Gore also testified that Kelsey went into the decedent's pockets after the shooting. (N.T. 02/21/2014, p. 61, 92, 107). Both Gore and Lester testified that both defendants left at approximately the same time. *Id.* at 66, (N.T. 02/20/2014, p. 87). Though Gore and Lester testified that Kelsey shot the victim, while according to Kelsey's statement, only Kelsey's companion shot the victim, under either scenario there is sufficient evidence to convict Kelsey of his crimes.

The only significant difference between Kelsey's statement and the testimony of Gore and Lester is that Gore and Lester claimed that Kelsey shot the victim, while according to Kelsey's statement, the only shot fired was fired by "the other guy" who was accompanying him. (N.T. 02/24/2014, p. 81-82). In either scenario, the evidence is sufficient to find Kelsey guilty of second-degree murder. Kelsey conspired with his companion to rob the victim, and is, therefore, guilty of any acts done in furtherance of the conspiracy by his co-conspirator. There is sufficient evidence to convict Kelsey of conspiracy; the jury could have concluded beyond reasonable doubt that Kelsey and his companion entered into and carried out an agreement to rob the victim after learning that the victim had shorted Kelsey on the marijuana purchase. The evidence is also sufficient to find Kelsey guilty of robbery. Kelsey admitted in his statement to taking a little over a hundred dollars from the victim's pockets after he had been shot and had fallen to the

17

ground. *Id.* at 81. Gore also stated that Kelsey went into the victim's pockets after the victim had been shot. (N.T. 02/21/2014, p. 61, 92, 107).

At trial, counsel suggested that Gore was not a credible witness. Although on the evening of the incident Gore initially told Detective Lucke that the perpetrators were two men in ski masks (N.T. 02/24/2014, p. 52), Gore's explanation for fabricating his original story is persuasive. According to Detective Lucke, Gore was visibly shaken by what had just transpired. *Id.* at 53. Detective Lucke described him as being very scared and nervous. *Id.* Gore also described to Detective Lucke the person who had been killed as a very good friend of his, a long-time friend. *Id.* At trial, Gore explained that initially he had told police the story about the masked men because he was afraid for his life. (N.T. 02/21/2014, p. 67). At trial, Gore also suggested that he did not initially tell the truth about what had happened because Kelsey was a close friend of his. *Id.* at 67-68. This court finds Gore's explanation for the differing stories he told police to be persuasive. Gore was visibly shaken by what had happened, and he was afraid for his own life. Both Kelsey and the victim were friends of his, and Gore had just witnessed a violent murder. It was, therefore, expectable that initially Gore was not completely forthcoming about what had actually happened.

Defendant argues that the evidence was insufficient to convict him of possessing an instrument of crime. To find a defendant guilty of possessing an instrument of crime, the jury must find that each of the following three elements have been proved beyond reasonable doubt. 18 Pa.C.S.A § 907. First, that the defendant possessed an item; second, that the item was an instrument of crime; and third, that the defendant possessed the item with the intent to employ it criminally. *Id.* There was sufficient evidence for the jury to find beyond reasonable doubt that all three elements were satisfied and that the defendant possessed an instrument of crime. Kelsey

18

admitted that he and his companion traveled back to 5530 Willows Avenue after being shorted on the previous marijuana purchase. (N.T. 02/24/2014, p. 79). Kelsey stated that his goal in traveling back to 5530 Willows Avenue was to "straighten out" the dispute over the marijuana. *Id.* at 83. When Kelsey and his companion arrived, a fight ensued between Kelsey and the decedent and that Kelsey stated, "Fuck that. I want mine." *Id.* at 80. Kelsey said that he then pulled out his gun and that his companion shot the victim. *Id.* at 80-81. There was more than enough evidence for the jury to find beyond reasonable doubt that Defendant Kelsey was guilty of possessing an instrument of crime.

The Defendant also argues that there was insufficient evidence to convict him of carrying a firearm without a license. To find the defendant guilty of carrying a firearm without a license, the jury must find that three elements have been proved beyond reasonable doubt. 18 Pa.C.S.A. § 6106. First, that the defendant carried a firearm concealed on or about his person; second, that the defendant was not in his home or place of business; and third, that the defendant did not have a valid and lawfully issued license for carrying the firearm. *Id.* There was sufficient evidence for a jury to find all three elements. Kelsey himself admitted to pulling out his gun at 5530 Willows Avenue after arriving there with his companion; obviously he must have carried the firearm concealed on or about his person on his way to that address. Second, 5530 Willows Avenue was not Kelsey's home or place of business. Third, Kelsey did not have a lawfully issued license for carrying his firearm. (N.T. 02/24/2014, p. 94), (Cmwlth. Ex. C-39).

Defendant argues that the evidence was insufficient to convict him of carrying a firearm on the public streets. To find the defendant guilty of carrying a firearm on the public streets, the jury must find that each of the following elements has been proved beyond reasonable doubt. 18 Pa.C.S.A. § 6108. First, that the defendant carried a firearm on the public streets of Philadelphia,

19

and second, that the defendant did not have a valid and lawfully issued license to carry the firearm. *Id.* There was sufficient evidence for the jury to find both elements.

Defendant Kelsey that argues there was insufficient evidence to convict him of intimidation of a witness. To convict a defendant of intimidation of a witness, three elements must be proved beyond reasonable doubt. First, that the defendant intimidated or attempted to intimidate a witness into refraining from reporting to a law enforcement officer information relating to the commission of a crime; second, that this action was undertaken with the intent to obstruct, impede, or interfere with the administration of criminal justice; and third, that the case in which the perpetrator sought to intimidate the witness involved a charge of first-degree murder or second-degree murder or involved a felony of the first degree. 18 Pa.C.S.A. § 4952. There was sufficient evidence to prove each element beyond reasonable doubt. According to Gore's testimony at trial, once Defendant Kelsey had shot the victim, he pointed his gun at Gore and told him not to say anything. (N.T. 02/21/2014, p. 61). Gore's testimony was also corroborated by Lamont Lester, who testified at trial that after Kelsey shot the victim, Defendant Kelsey pointed his gun at Gore and warned him, "You better not say nothing." (N.T. 02/20/2014, p. 87).

20

## CONCLUSION

The arguments made by defendant lack merit. For the reasons set forth above,

Defendant's judgment of sentence should be affirmed.

BY THE COURT:

STEVEN R. GEROFF, J.

21